```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
ROCOCO ASSOCS., INC.,

            Plaintiff,

      -against-                         MEMORANDUM AND ORDER
                                        06-CV-0975 (JS)

AWARD PACKAGING CORP. and R&E
PACKAGINGA, LLC,
            Defendants,

      -against-

RICHARD L. COHEN and MARVIN
ROSENBERG,

            Third-Party Defendants.
----------------------------------X
```
APPEARANCES:
For Plaintiff
and Third-party
Defendants:         James P. Rigano, Esq.
                    Candace Reid Gladston, Esq.
                    Certilman Balin Adler & Hyman, LLP
                    1393 Veterans Memorial Hwy., Suite 301S
                    Hauppauge, NY 11788

For Defendants:     Adam E. Engel, Esq.
                    Debra L. Rothberg, Esq.
                    DL Rothberg & Associates, P.C.
                    331 Madison Avenue, 2nd Floor
                    New York, NY 10017

SEYBERT, District Judge:

   Pending before the Court is a motion for summary judgment filed by Award Packaging Corporation ("Award") and R&E Packaging, LLC ("R&E") (collectively, "Defendants") seeking dismissal of all of the claims of Rococo Associates, Inc. ("Rococo" or "Plaintiff") and also partial summary judgment on their counterclaims against Plaintiff and the Third-Party Defendants, Richard L. Cohen

("Cohen") and Marvin Rosenberg ("Rosenberg"). For the reasons discussed below, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

This civil action concerns environmental cleanup liability stemming from Award's use of volatile organic compounds ("VOCs") and metals in connection with its printing business at an industrial property located at 625 South Street, Garden City, New York ("Premises").

In 1967, Plaintiff's predecessors-in-interest[1] and Award entered into a contract which arranged for construction on, and the long-term lease of, the Premises where Award would carry on its business of printing on plastic bags and other packaging materials. Joint Pre-Trial Order ("JPTO"), Docket Entry No. 61, p. 22-23. Both parties acknowledged at the time that in its regular course of business Award would routinely handle and use VOCs and other substances inimical to the environment. Id.

For this reason, pursuant to their agreement, Plaintiff designed and constructed an explosion-resistant ink room to store the chemicals. The ink room's floor drain ("DW-1") and "spill capture system" (which simply consisted of a 55-gallon drum

---

[1] The Premises were originally acquired by a partnership that included Allen Rothenberg, David Cohen, and the Third-Party Defendants, Marvin Rothenberg and Richard Cohen. In 1985, the partners transferred their individual interests in the Premises to Plaintiff Rococo, of which the partners became shareholders.

ensconced in the ink room's floor) constitute one of the two chief areas of contamination in this action. Id.

The second contamination area comprises two drywells ("DW-2" and "DW-3") situated on the northwest corner of the Premises where Award would dump chemical waste. Id. Although not designed for the purpose of receiving such contaminants, the parties agree that the drywells--and, for that matter, the floor drain--satisfy the United States Environmental Protection Agency's ("EPA") definition of an "underground injection well." The drywells are therefore regulated under the Underground Injection Control ("UIC") program superintended by the EPA. JPTO ¶ 4.

In the period between 1967 and the early 1980s (when wastes were henceforward "manifested" offsite), it is estimated that Award dumped approximately 110,000 to 137,000 gallons of polluting waste into the two drywells. Defs.' Mem. in Supp. of Mot. Summ. J. ("Defs. Br."), Ex. 9. As a result, in the early 1990s, the EPA advised the Defendants that the floor drain and drywells were in need of environmental remediation. Accordingly, over the course of several years, Defendants consulted with experts, formulated work plans, submitted them to the EPA, and at length created a final, approved remediation plan embodied in two documents drafted by Environmental Resources Management ("ERM"), Defendants' environmental engineer: the Report on Findings of Site Investigation of Abandoned Drywells and Floor Drain ("Report") and

the Remedial Action Plan ("RAP").

Armed with the Report and the RAP, Plaintiff and the Defendants engaged in protracted negotiations over which party would bear the remediation costs and undertake implementation of the RAP. Negotiations culminated in the Settlement Agreement, by the terms of which Defendants committed to reimburse Plaintiff in the amount of $267,300.00 and to nonsuit a pending tax certiorari action; Plaintiff meanwhile promised to implement the RAP at its own expense in compliance with all laws, as required by the EPA pursuant to the UIC program, and to indemnify Defendants and hold them harmless for all remediation associated with the floor drain and drywells. Defs. Br., Ex. 1.

In its preambulary section, the Settlement Agreement defines which sections of the Premises Plaintiff would be responsible for decontaminating:

> WHEREAS, both the Report and the RAP only addressed environmental contamination existing in <u>an interior floor drain</u> in a storage room in the Premises (delineated DW-01 in the Report and the RAP), <u>and in two (2) outdoor drywells</u> located near the northwest corner of the Premises (delineated DW-02 and DW-03 in the Report and the RAP) (DW-01, DW-02, DW-03 are hereinafter collectively referred to as the "Site").

Defs. Br., Ex. 1. (Emphasis added.)

Paragraph Nine of the Settlement Agreement, entitled "Release", provides:

> The Landlord, Cohen and Rothenberg, shall

4

> hereby release and discharge the Tenant, and shall waive any right or claim of right against the Tenant, from all actions, causes of action, suits, debts, damages, assessments, liabilities, clean-up costs, interest, penalties, judgments, losses, claims and demands whatsoever, in law or equity, which the Landlord, Cohen and Rothenberg now have or hereinafter may have against the Tenant for environmental contamination at the Site, <u>as specifically addressed in the Report</u>.

Id. (Emphasis added.)

The Report, which is specifically incorporated by reference into the Release supra, defines its scope as covering two drywells and a floor drain. Defs. Br., Ex. 10. Section 1.3 of the Report, entitled "Project Objectives and Scope", contains this introductory sentence: "The objective of the limited site investigation was to collect waste characterization samples from the two abandoned drywells and the abandoned floor drain located in a storage room within the building." Similarly, Section 3.0 of the RAP (also incorporated into the Settlement Agreement), entitled "Remedial Approach", reads: "The objective of the proposed remedial action is to safely remove impacted materials within the two abandoned drywells and the abandoned floor drain, via excavation and off-site disposal." Defs. Br., Ex. 11.

In specifying the digging procedures to be followed for removal of the contaminants in both the drywells and the floor drain, the RAP notes that excavation would extend "to a depth of approximately twenty (20) feet below grade." Id. There is no

5

explicit statement in the document of precisely how deep the excavators would dig to accomplish their goal of removing all contaminants from the Site; there are, however, some subtle indications, perhaps, that by "approximately twenty (20) feet below grade", the RAP may have contemplated deeper levels. For one thing, the team that prepared the RAP sent soil borings into the drywells down to a maximum depth of sixteen feet (and no deeper lest they push the contaminated material deeper still) and encountered contaminants every step along the way. Id. At least partly for this reason, the RAP estimates that excavation would have to reach "approximately", as opposed to exactly, twenty feet below grade, the more so as the exact depth of the contaminants was unknown. Id. Second, the RAP may entertain the contingency of digging deeper than twenty feet in its provision that "in the event that groundwater is encountered, the soil samples will be collected from the side walls approximately one (1) foot above the apparent water table." Id. Third, Plaintiff acknowledges that previous soil tests discovered contaminants as deep as 30 feet. Defs. Br., Ex. 9.

In the event, Plaintiff, forced to excavate to a depth of approximately thirty-two feet below grade, was thereby required to execute a new contract with the Hazardous Elimination Corporation[2]

---

[2] Plaintiff hired the Hazardous Elimination Corporation to implement the RAP.

("HEC") at additional cost. Pl.'s Mem. in Opp. to Summ. J. ("Pl. Br."), p. 13. There is a dispute among the parties whether, under the Settlement Agreement, it was the Plaintiff's contractual obligation to excavate to this depth in spite (or because) of the RAP's instruction to dig "to a depth of approximately twenty (20) feet below grade."

Moreover, Plaintiff has pled[3], and adduced evidence to suggest the existence of, contamination found in other areas of the Premises beyond the two drywells and floor drain (including five stormwater drainpools and in groundwater samples[4]). Defendants' expert disputes these assertions. Defs. Br., Ex. 7. There remains, then, a dispute of fact (for if contamination exists outside the parameters of the Report and Rap, the settlement

---

[3] Seizing on a clause in Paragraph 30 of the Complaint, Defendants insist that the Complaint pleads only a single allegation which arguably falls outside the scope of the Settlement Agreement; namely, that the contamination in the two drywells and floor drain extended to depths not specifically addressed in the agreement. However, this reading ignores the rest of the paragraph which alleges that the contamination "was present at the Premises at levels that exceeded the applicable State cleanup criteria." Pl.'s Compl., ¶ 30 (emphasis added). It also ignores follow-up allegations claiming that Defendants polluted more broadly at the Premises. Id., ¶¶ 38-39.

[4] See Affidavit of Stephanie O. Davis ("Davis Aff."), ¶ 8. Defendants object to the Davis Affidavit, which includes amended expert testimony submitted after the close of expert discovery. Nevertheless, "[i]mposition of [preclusive] sanctions under Rule 37 is a drastic remedy and should only be applied in those rare cases where a party's conduct represents flagrant bad faith and callous disregard of the Federal Rules of Civil Procedure." Hinton v. Patnaude, 162 F.R.D. 435, 439 (N.D.N.Y. 1995). The Court finds neither bad faith nor callous disregard.

7

agreement does not foreclose Plaintiff's CERCLA recovery).

It is undisputed that HEC did not comply with at least some of the provisions of the RAP, which incorporated relevant legal cleanup requirements set by the EPA. Id., p. 20. At the same time, notwithstanding Defendants' insistence to the contrary, there is a genuine dispute over the material issue of whether this partial noncompliance rendered Plaintiff's remediation effort inconsistent with the National Contingency Plan ("NCP"), which is a necessary criterion for a CERCLA claim. See Section B infra. For within Defendants' own exhibits is evidence that the Nassau County Department of Health at least partially directed the excavation at issue. Defs. Br., Ex. 22, p. 33; see also Gold Dep., p. 70.

In March 2006, Plaintiff filed suit against the Defendants based on the additional clean-up costs it bore, alleging five claims for relief: (1) monetary, injunctive and declaratory relief pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601-9607(c)("CERCLA"); (2) the same relief pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901-6992h ("RCRA"); (3) declaratory relief pursuant to 28 U.S.C. §§ 2201, 2201; (4) Restitution; and (5) Equitable or Implied Indemnification.

8

DISCUSSION

I.  Rule 56: Standard of Review

A district court may properly grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

"In assessing the record to determine whether there is a genuine issue to be tried . . . the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

Mere conclusory allegations, speculation or conjecture will not avail a party opposing summary judgment, see Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996), and "[f]actual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986) (citing 10A Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2725, at 93-95 (1983)).

A. <u>The Settlement Agreement</u>

Settlement agreements, such as the one entered into by the parties here, being contracts, are therefore governed by general principles of contract law. See, e.g., <u>Torres v. Walker</u>, 356 F.3d 238, 254 (2d Cir. 2004).

Among these general principles, one of the most basic is the cardinal rule that a motion for summary judgment in a contract dispute may be granted only where the agreement's language is unambiguous and imparts a definite meaning. See, e.g., <u>Sayers v. Rochester Telephone Corp. Supplemental Management</u>, 7 F.3d 1091, 1094 (2d Cir. 1993). Put another way, if the contract's language is susceptible of more than one reasonable construction, and if the parties furnish the court with relevant extrinsic evidence of their actual intent, the meaning of the contract creates an issue of material fact. <u>Seiden Assocs. v. ANC Holdings, Inc.</u>, 959 F.2d 425, 428 (2d Cir. 1992). In determining whether the language is ambiguous, the court must consider it in the context of the entire integrated agreement. See, e.g., <u>Walk-In Medical Centers, Inc. v. Breuer Capital Corp.</u>, 818 F.2d 260, 263 (2d Cir. 1987).

Here, the Court finds that the Settlement Agreement, in light of the language in the RAP, which is incorporated into the Settlement Agreement, is susceptible of more than one reasonable interpretation, and hence ambiguous. Specifically, it is not clear whether "approximately 20 feet" was intended as a limitation on the

depth to which the Plaintiff was responsible for digging. On the one hand, the RAP's objective was seemingly to remediate all of the contamination from the drywells and the floor drain, (see Sections 1.3 and 3.0). On the other hand, the Court presumes the parties deliberately included the modifier "approximately" next to "twenty feet." In short, whether the parties intended "approximately twenty feet" to be a limitation on the Defendant's responsibility or merely a description of what the parties anticipated the work would entail is a material question of fact. Accordingly, the Court cannot enter summary judgment on the strength of the Settlement Agreement.

B. Plaintiff's CERCLA and Declaratory Judgment Claims

CERCLA represents a "comprehensive federal law governing the remediation of sites contaminated with pollutants." Consol. Edison of N.Y., Inc. v. UGI Utils., Inc., 423 F.3d 90, 94 (2d Cir. 2005). Inasmuch as CERCLA encourages remediation by allowing the remediating party to seek recovery from others, under 42 U.S.C. § 9607(a), a potentially responsible party ("PRP") is authorized to sue other PRPs to recover costs and damages sustained in cleaning up a contaminated site. Id. at 94.

To prevail in a CERCLA action against a PRP, a plaintiff must establish that: (1) the defendant is in fact a PRP; (2) the site is a facility; (3) there was a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred

11

costs in responding to the release or threatened release; and (5) the costs and response actions conform to the national contingency plan ("NCP") under CERCLA. See B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1198 (2d Cir. 1992).

Defendants exclusively focus on the fifth element, contending that there is no disputing that Plaintiff's remediation was so deficient that it was not in conformity with the NCP. In particular, Defendants cite the "undisputed" facts that Plaintiff retained a remediation firm (HEC) whose principal (Donald Gold) admitted in deposition that he was unfamiliar with the UIC program; that there were aspects of the EPA-approved RAP which Plaintiff did not follow; that HEC excavated the drywells beyond the twenty foot depth estimated in the RAP[5] down to the watertable without employing the engineering controls required in the RAP; and that Plaintiff failed to employ a structural engineer to design the excavation of the interior floor drain.

Yet within Defendants' own exhibits is evidence that the Nassau County Department of Health at least partially directed the excavation at issue. Defs. Br., Ex. 22, p. 33; see also Gold Dep., p. 70. What is more, accompanying Plaintiff's opposition is a copy of a consent order issued by the New York State Department of

---

[5] Thus it is that Defendants simultaneously charge that Plaintiff may not proceed with its CERCLA claim because it was obliged to dig below "approximately" twenty feet and, separately, because it in fact did dig below twenty feet.

Environmental Conservation ("NYDEC") for remediation work at the Premises. See Gladston Declaration, Ex. M. To establish compliance with the NCP, a plaintiff need only show that its remediation was conducted under the aegis of a state environmental agency. Niagra Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 137 (2d Cir. 2010). Thus there exists a genuine dispute over a material fact which Defendants, who bear the initial burden here, have not laid to rest. See City of New York v. Exxon Corp., 633 F. Supp. 609, 616 (S.D.N.Y. 1986) (holding that consistency vel non with the NCP is a question of fact for the jury). Accordingly, Defendants' motion for summary judgment on Plaintiff's CERCLA claims is DENIED.

C. Plaintiff's RCRA Claim

Pursuant to RCRA §7002(A)(I)(B), Plaintiff seeks an order "enjoining Award from disposal of solid and hazardous waste at the Premises and directing Award to investigate and remediate, at its expense and in accordance with the mandates of all involved administrative agencies, the contamination caused by its disposal practice." Pl.'s Compl., ¶75 (emphasis added).

Defendants' primary argument with respect to this claim, which the Court finds persuasive and which Plaintiff neglects to rebut in its opposition, is that Plaintiff seeks to enjoin activity in which Defendants no longer engage and to direct a remediation which is already being conducted under the supervision of the

NYDEC. In other words, the Court cannot award the relief sought, the argument goes.

RCRA precedent supports Defendants' position. A court's RCRA jurisdiction:

> extends only to the provision of injunctive relief to remove, to the extent possible, the danger to health and safety, not to determine blame for the condition in order to determine who is responsible. . .

87th St. Owners Corp. v. Carnegie Hill-87th St. Corp, 251 F. Supp. 2d 1215, 1221 (S.D.N.Y. 2002).

In 87th St. Owners, as here, a plaintiff brought suit under the RCRA seeking prohibitive injunctive relief for polluting activities that were no longer occurring at the time of the motion for summary judgment. Similarly, the plaintiff requested that the court direct the defendant to assume full responsibility for a then-ongoing cleanup superintended by the NYDEC. Id. at 1220. In such circumstances, the court held, there was nothing for it to restrain or direct in furtherance of the statute's goal of remediating "hazardous waste which may present an imminent and substantial endangerment to health or the environment." Id. citing 42 U.S.C. § 6972(a)(1)(B).

Here, it is undisputed that Award vacated the Premises as of January 1, 2007, since which time it has not conducted any manner of business there at all. Def.s' Supp. Stmt. of Facts, ¶ 126. Moreover, Plaintiff's attachments amply demonstrate that the

14

NYDEC, together with Plaintiff, has acted and is still acting to remediate the hazardous conditions at the Premises. See Gladston Declaration, Ex. M.

Following the persuasive logic of the 87th St. Owners court, the Court finds that "ordering defendant to take over operation of the system that has been installed by NYDEC to ameliorate the effects of the spill would do nothing to improve the operation of that system." 87th St. Owners, 251 F. Supp. 2d at 1220.

In sum, properly understood, Plaintiff's claims concern determining blame for the contaminated environmental conditions at the Premises. Thus, their bid for injunctive relief is inappropriate. Accordingly, Defendants' motion for summary judgment on its RCRA claim for injunctive relief is GRANTED.

D. Defendants' Counterclaims

Along with their Answer, Defendants filed counterclaims against Plaintiff and the Third-Party Defendants Cohen and Rosenberg, including one for breach of contract on which Defendants move for summary judgment.

To establish a prima facie case for breach of contract under New York law, a plaintiff must plead and subsequently prove: (1) the existence of a contract; (2) a breach thereof; and (3) damages resulting from the breach. See, e.g., National Market Share, Inc. v. Sterling Nat. Bank, 392 F.3d 520, 525 (2d Cir.

15

2004). For the last element, a plaintiff must prove that a defendant's breach directly and proximately caused the complained-of damages. Id.

Defendants assert, and Plaintiff does not dispute, that Plaintiff's remediation firm, HEC, failed to comply with at least some of the guidelines set forth in the RAP, the fulfilment of which is incorporated into the parties' contractual duties. Pl. Br., p. 20. In other words, breach is virtually conceded by the Plaintiff. Yet Defendants claim in the way of damages that the breach "resulted in the State notification to Defendants that they are potentially liable for the costs of additional remediation caused by the Premises being listed on the State Superfund Registry." As proof linking the RAP breach to the damages sustained by the addition of the Premises to the State Superfund Registry, Defendants cite their expert report ("Smith Report") which concludes in pertinent part that the failure of Rococo to hire a qualified environmental professional to complete the remediation work potentially led to an increased level of regulatory enforcement. Defs. Mot. for Summ. J., Ex. 7, ¶ 53.

Against this opinion, however, Plaintiff has submitted (albeit belatedly; see footnote three, supra) the Davis Affidavit which contends that, contra the Smith Report, the remedial work conducted by the HEC did not result in the spread of contaminations to deeper soils. Davis Aff., ¶ 16.

Because there is thus a genuine dispute as to the material fact of whether Plaintiff's failure to comply with the RAP (as incorporated into the Settlement Agreement) proximately caused the Premises to be added to the State Superfund Registry, Defendants' motion for summary judgment on their breach of contract counterclaim is DENIED.

CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART. Plaintiff's RCRA claim for injunctive relief is dismissed. Defendants' motion is denied in all other respects. The parties are directed to appear before this Court for a pretrial conference on April 29, 2011 at 1:45 p.m.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: March  30 , 2011
Central Islip, New York